IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SNOWSTORM ACQUISITION CORPORATION | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 09-866-SLR |
| TECUMSEH PRODUCTS COMPANY, ALIXPARTNERS, LLP, AP SERVICES, LLC and JAMES BONSALL | ) ) ) ) | |
| Defendants. | ) ) | |

Etta R. Wolfe, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Plaintiff. Of counsel: Mark S. Baldwin, Esquire, Jennifer Mullen St. Hilaire, Esquire, and Dylan P. Kletter, Esquire of Brown Rudnick, LLP, Hartford, Connecticut.

Ian Connor Bifferato, Esquire and Thomas F. Driscoll III, Esquire of Bifferato LLC, Wilmington, Delaware. Counsel for Defendants AlixPartners, LLP, AP Services, LLC and James Bonsall. Of Counsel: Kenneth E. Rechtoris, Esquire and Todd E. Pentecost, Esquire of K&L Gates LLP, Chicago, Illinois.

**MEMORANDUM OPINION**

Dated: September 21, 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Snowstorm Acquisition Corporation ("Snowstorm") filed this action against defendants Tecumseh Products Company ("Tecumseh Products"), AlixPartners, LLP ("AlixPartners"), AP Services, LLC ("APS"), and James Bonsall ("Bonsall")[1] on November 13, 2009, alleging: (i) breach of contract; (ii) violation of § 10(b) ("§ 10(b)") of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; (iii) violation of § 20(a) of the Act, 15 U.S.C. § 78t(a); (iv) common law fraud; (v) declaratory judgment; and (vi) negligent misrepresentation. (D.I. 1)  Presently before the court is the APS Parties' motion to dismiss counts (ii)–(iv) and (vi) pursuant to Federal Rule of Civil Procedure 9(b) for failing to comply with the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), and under Federal Rule of Civil Procedure 12(b)(2), for lack of personal jurisdiction over Bonsall, and 12(b)(6), for failure to state a claim for which relief may be granted.  (D.I. 10)  The court has jurisdiction under § 78aa of the Act, and  28 U.S.C. §§ 1331 and 1367.[2]  For the reasons set forth below, the court grants in part and denies in part the APS Parties' motion.

---

[1]AlixPartners, APS, and Bonsall are hereinafter collectively referred to as "the APS Parties."  Tecumseh Products is represented by separate counsel and is not a party to the present motion.

[2]This court has jurisdiction over Snowstorm's pendent state claims against the APS Parties by virtue of the fact that they share the same nucleus of operative facts as Snowstorm's federal claims.

## II. BACKGROUND

### A. The Parties

Snowstorm is a Delaware corporation with its principal place of business in Beverly Hills, California. (D.I. 1 at ¶ 1)  Snowstorm acquired TecumsehPower Company ("TecumsehPower") from Tecumseh Products on November 9, 2007. (*Id.* at ¶ 47)

AlixPartners is a Delaware limited liability partnership with its principal place of business in Southfield, Michigan. (*Id.* at ¶ 3)  AlixPartners is engaged in, inter alia, the business of improving corporate financial and operational performance, and executing corporate turnarounds. (D.I. 12, Tab 11 at ¶ 3)  APS is a Michigan limited liability company with its principal place of business in Southfield, Michigan. (D.I. 1 at ¶ 4)  APS is a wholly-owned subsidiary of AlixPartners. (*Id.*)

Bonsall is a managing director of AlixPartners, Executive Vice President of Tecumseh Products, and President of TecumsehPower. (D.I. 12, Tab 11 at ¶ 3)  Bonsall is a citizen of Michigan living and working in Munich, Germany.

### B. Tecumseh Products engages the APS Parties

The present controversy centers around the acquisition of TecumsehPower–the engine manufacturing division of Tecumseh Products–which was incorporated in approximately 2002. (D.I. 1 at ¶ 9)  By July 2005, TecumsehPower was experiencing significant financial difficulties, so Tecumseh Products engaged AlixPartners and APS to facilitate improvement of TecumsehPower's financial condition. (*Id.* at ¶ 10)  In furtherance of the improvement efforts, Tecumseh Products entered into Letter

2

Agreements with AlixPartners and APS, through which Bonsall was given the title of President of TecumsehPower along with the responsibility of ensuring improvement for TecumsehPower. (*Id.* at ¶ 11) Additionally, the Letter Agreements afforded key personnel to assist in the efforts of the APS Parties, including Bob Busch ("Busch"), who was to act as Vice President in support of Bonsall. (*Id.*) On or around January 19, 2007, Bonsall was named Interim President and Chief Operating Officer of Tecumseh Products and, on or around September 1, 2007, he was named Executive Vice President. (*Id.*)

In accordance with the terms of the Letter Agreements, Tecumseh Products paid AlixPartners a fixed fee of $850,000 plus "monthly contingent success fees" based on AlixPartner's ability to improve TecumsehPower's "on-going cash flow" including "inventory-related cost reductions . . . manufacturing efficiencies, quality improvements, transportation cost reductions and reducing or eliminating capital expenditures . . . ." (*Id.* at ¶ 13) Between July 2005 and year-end 2007, Tecumseh Products paid AlixPartners in excess of $37 million for services rendered. (*Id.*)

During the period of the Letter Agreements, the APS Parties implemented several strategic changes as advisors to Tecumseh Products. Significantly, the APS Parties advised TecumsehPower to shut down its lawn and garden engine business which had previously constituted approximately 31% of TecumsehPower's annual revenues. (*Id.* at ¶ 15) Following this decision, TecumsehPower's snow thrower engine line constituted the majority of TecumsehPower's annual sales at between 54% and 64%. (*Id.* at ¶ 16) In addition, the APS Parties made changes to TecumsehPower's

3

Quality Assurance Group's "zero tolerance" customer complaint goal. (*Id.* at ¶ 18) As a result, instead of tracking every quality complaint made by customers, as it had previously done,[3] the APS Parties instructed TecumsehPower to track only the complaints that required a written response (known as "spills"). (*Id.* at ¶¶ 18-19) According to Snowstorm, AlixPartners received a contingency fee based on the reduced complaint volume that resulted. (*Id.* at ¶ 19) Further, Snowstorm alleges that AlixPartners instructed TecumsehPower to refrain from: (1) including any other types of information in Quality Assurance reports; (2) including any type of "anecdotal" information in Quality Assurance reports; and (3) "editorializing" in any such reports. (*Id.* at ¶ 20) Quality Assurance employees were also instructed not to bring up quality issues in group meetings, and any employees who refused to cooperate were instructed not to attend group meetings. (*Id.*)

### C. The Failing MTD Relationship

Historically, MTD Products, Inc. ("MTD") was one of TecumsehPower's largest clients. (*Id.* at ¶ 22) MTD is a market leader–with annual revenues in excess of $1 billion–in the design and manufacture of outdoor power equipment, including lawnmowers, snow throwers, chain saws, hedge trimmers, chippers and riding tractors. (*Id.* at ¶ 21) MTD had accounted for over 50% of TecumsehPower's overall engine business, and was TecumsehPower's largest client in the snow thrower business, where TecumsehPower controlled approximately 80% of the market. (*Id.* at ¶ 22) For

---

[3]Prior to the changes made by the APS Parties, whenever an engine or part was identified by a customer as defective or non-conforming, it would be catalogued by TecumsehPower and then reflected on its monthly Executive Reports on a "parts per million" ("PPM") basis in accordance with industry customs. (D.I. 1 at ¶ 18)

much of this time, TecumsehPower had been MTD's exclusive provider of snow thrower engines, operating under a series of three-year memoranda of understanding ("MOU"). (*Id.* at ¶¶ 21-22)  On March 18, 2005, MTD and TecumsehPower entered into the "Snow Product Line" MOU (the "Snow MOU") which established an exclusive relationship between the two companies.  (*Id.* at ¶ 23)  The Snow MOU was to expire on February 28, 2008, but an "evergreen" provision provided that, in the event the Snow MOU is not terminated at least "90 days prior to [the] end of any given term," the Snow MOU automatically renew[ed] for an additional year upon completion of the initial term and/or any renewal term . . . ."  (*Id.* at ¶ 24)

By mid-2006, the relationship between MTD and TecumsehPower had become strained.  (*Id.* at ¶ 25)  On July 17, 2006, MTD sent a letter to Bonsall, as President of TecumsehPower, in which it advised that "[e]vents over the past year are such that the third year contemplated under the Snow MOU is simply not feasible at this point."  (*Id.*)  The letter cited several issues, including the fact that "Tecumseh[Power] continues to have snow engine quality issues and has shown an inability to effectively resolve issues once identified."  (*Id.*)  Two days later, Bonsall responded to MTD in an email seeking MTD's affirmance that it "has no grounds to, nor does it presently intend to, cancel the [Snow] MOU during the term provided in the agreement."  (*Id.* at ¶ 26)  On July 31, 2006, MTD replied to Bonsall:

> For the reasons discussed in [the] July 17, 2006 letter to you it is MTD's position that [TecumsehPower] has breached the [Snow] MOU.  As a result, it is MTD's position that the [Snow] MOU is now terminated. . . . [U]nder the circumstances[,] MTD simply cannot commit to making [TecumsehPower] its exclusive provider of snow engines through the 2008 season.

5

(*Id.* at ¶ 27)  Two days later, Bonsall responded that "MTD cannot unilaterally terminate the [Snow] MOU." (*Id.* at ¶ 28)  MTD maintained its position through oral and written correspondence that TecumsehPower was no longer MTD's exclusive snow thrower engine supplier. (*Id.* at ¶ 29)

In February 2007, MTD sent TecumsehPower a "Supplier Performance Scorecard" in which TecumsehPower was rated as sub-standard and below unacceptable. (*Id.* at ¶ 30)  Specifically, in the quality category, MTD gave TecumsehPower a score of 13 out of 40, and in the "PPM" subcategory,[4] MTD scored TecumsehPower 0 out of 14. (*Id.*)

Despite MTD's low ratings of TecumsehPower's Quality Assurance Program, TecumsehPower attempted to salvage the relationship through new, multi-year MOUs in the snow thrower division. (*Id.* at ¶ 31)  MTD was not interested in maintaining a long-term relationship. (*Id.*)  In fact, by January 2007, MTD was taking efforts in furtherance of engaging a Chinese supplier and Briggs & Stratton in order to replace TecumsehPower as its supplier of snow thrower engines. (*Id.* at ¶ 32)  Bonsall and other senior management at TecumsehPower were aware of rumors circulating about MTD seeking other suppliers, to which Bonsall and the other senior executives referred as "f you very much." (*Id.*)

### D. The Material Misrepresentations and Omissions

Shortly after Bonsall was named Interim President and Chief Operating Officer of

---

[4]This subcategory graded TecumsehPower based on the number of "nonconforming product in parts per million ([quantity] of parts rejected [versus] [quantity] received), over both the 'review period' and past 12 month period." (*Id.* at ¶ 30)

Tecumseh Products on January 19, 2007, the decision was made to sell TecumsehPower due to the loss of MTD's business. (*Id.* at ¶¶ 33-34)  To assist in the sale, Tecumseh Products hired Rothschild, Inc. ("Rothschild"), an investment banking firm. (*Id.* at ¶ 34)  Rothschild prepared a Confidential Information Memorandum (the "CIM") which it provided to potential acquirers, including Snowstorm's representatives, as well as the APS Parties. (*Id.*)  The CIM contained historic financial data about TecumsehPower, its product lines, and a description of the snow thrower market. (*Id.* at ¶ 35)  Further, the CIM acknowledged that TecumsehPower had "recently exited [the] vertical[ ] lawn and garden [business] . . . ," and stated that TecumsehPower historically had "approximately an 80% share of industry volume . . . " in the snow thrower line of business. (*Id.*)  In addition, the CIM made several representations regarding the strength of TecumsehPower's snow thrower business, including:

> (a) "This is a sustained industry segment that [TecumsehPower] has successfully defended since the 1960's."

> (b) TecumsehPower "has a strong reputation with the Snow King brand of durable engines that function reliably under the most extreme conditions."

> (c) TecumsehPower "enjoys a high level of integration with the customer's product development process.  Through the years this has translated into long-standing customer relationships.  The strong relationships include . . . MTD.  [TecumsehPower] has enjoyed relationships with each of its top five customers for over 20 years."

(*Id.* at ¶ 36)

On or about August 8, 2007, Bonsall lead a Management Presentation to Snowstorm's representatives in which he made additional representations:

> (a) TecumsehPower has a "leading position in the snow thrower industry."

7

(b) TecumsehPower has "well-established customer relationships."

(c) The "long[-]term trend for the Snow Thrower . . . market [ ] has been one of continued growth."

(d) "[TecumsehPower] . . . engines have been a market leader and driver of the snow category for 45 years."

(e) "[TecumsehPower] . . . engines will again represent an 80% industry share in 2007."

(f) "Sales declines in 2006 and 2007 for MTD are mostly attributable to the overall industry declines in snow thrower sales."

(g) "Snow sales are expected to rebound in 2008 from the weather-related downturn in 2007."

(*Id.* at ¶ 38)  Neither the CIM nor the Management Presentation referred Snowstorm to: (1) the snow thrower engine quality issues complained of by MTD; (2) the fact that MTD had terminated the Snow MOU on July 31, 2006; or (3) MTD's repeated refusal to enter into an exclusive and/or long-term relationship with TecumsehPower.  (*Id.* at ¶ 39) During the Management Presentation, Bonsall detailed the quality improvements that TecumsehPower had made during his employment.  (*Id.*)  Following the presentation, the APS Parties worked to facilitate a quick sale of TecumsehPower.  (*Id.* at ¶ 40) According to Snowstorm, the APS Parties wanted the sale to go through "before [the] snow [business] [numbers] come to light."  (*Id.*)

In the pendency of Snowstorm's acquisition of TecumsehPower, Snowstorm was precluded from contacting any of TecumsehPower's customers directly, including MTD. (*Id.* at ¶ 41)  The APS Parties felt that such contact would delay closing of the sale of TecumsehPower, and further rejected Snowstorm's requests to contact TecumsehPower employees who had close contact with MTD.  (*Id.*)  The APS Parties

8

insisted that the relationship with MTD was "very, very good," "still on target," "status quo," and "as good as any supplier's." (*Id.*) Despite these assurances, on or about September 14, 2007, the APS Parties had received confirmation that MTD was then in the process of finalizing its purchase of a 25% stake in a Chinese engine supplier which had "a complete line" of snow thrower engines. (*Id.* at ¶ 43) Further, on September 18, 2007, the APS Parties discovered that MTD was selling a snow thrower engine with a Chinese engine at Home Depot. (*Id.*)

### E. Snowstorm Acquires TecumsehPower

On October 22, 2007, Snowstorm entered into a Stock Purchase Agreement ("SPA") with Tecumseh Products, under which Snowstorm paid $51 million for all of the issued and outstanding capital stock of TecumsehPower. (*Id.* at ¶ 44) The SPA was executed by Bonsall as the Executive Vice President of Tecumseh Products.[5] (*Id.*) Contained within the SPA were several representations, including:

> (a) TecumsehPower is not "engaged in any material disputes with [MTD] . . . that would result in a material decrease in the quantity of items purchased . . . ." (SPA Section 3.17)

> (b) The Snow MOU is a "valid and legally binding obligation . . . [of MTD] . . . in accordance with its terms and conditions," and further, that neither MTD nor TecumsehPower was "in material breach or default [of the Snow MOU] . . . ." (SPA Section 3.9)

(*Id.* at ¶ 45) Purportedly in reliance of the representations made in the CIM, Management Presentation, and Sections 3.17 and 3.9 of the SPA, Snowstorm acquired all of the issued and outstanding shares of TecumsehPower on November 9, 2007. (*Id.*

---

[5] At that time, Bonsall was also a managing director of AlixPartners, President of TecumsehPower, a director of TecumsehPower and an employee of AlixPartners. (*Id.* at ¶ 44)

at ¶ 47)

Following the acquisition of TecumsehPower, Snowstorm was issued an "Officer's Certificate of Tecumseh Products Company" (the "Certificate"), executed by Bonsall, to confirm that representations made in the SPA were true as of the closing date. (*Id.* at ¶ 49)  At the time the Certificate was issued, Bonsall remained as Executive Vice President of Tecumseh Products. (*Id.*)

Shortly after the stock sale and issuance of the Certificate, TecumsehPower's new management met with MTD. (*Id.* at ¶ 51)  At that meeting, MTD informed the new TecumsehPower directors that:  (1) the relationship between MTD and TecumsehPower had been seriously jeopardized by TecumsehPower's performance over the past several years; (2) MTD's own customer relationships had also been damaged as a result of TecumsehPower's overall poor performance including, but not limited to, engine quality issues and, accordingly, MTD anticipated reduced revenue during the next season due to its own customers' shifting volume to MTD's competitors; and (3) MTD, prior to Tecumseh Products' sale of TecumsehPower, had communicated very openly to TecumsehPower's representatives and former management that TecumsehPower's snow engine business with MTD would likely be terminated. (*Id.*) The meeting ended with MTD's formal termination of its relationship with TecumsehPower. (*Id.*)  As a result, Snowstorm shut down TecumsehPower. (*Id.*)  On November 13, 2009, Snowstorm filed this suit. (*Id.* at 21)

10

## III. STANDARD OF REVIEW

### A. Motion to Dismiss Based on Lack of Personal Jurisdiction

Rule 12(b)(2) directs the court to dismiss a case when the court lacks personal jurisdiction over a defendant. Fed. R. Civ. P. 12(b)(2). When reviewing a motion to dismiss pursuant to Rule 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor. *Traynor v. Liu*, 495 F. Supp. 2d 444, 448 (D. Del. 2007). Once a jurisdictional defense has been raised, the plaintiff bears the burden of establishing, with reasonable particularity, that sufficient minimum contacts have occurred between the defendant and the forum to support jurisdiction. *See Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987). To meet this burden, the plaintiff must produce "sworn affidavits or other competent evidence," since a Rule 12(b)(2) motion "requires resolution of factual issues outside the pleadings." *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 67 n. 9 (3d Cir. 1984).

### B. Motion to Dismiss for Failure to State a Claim for Which Relief Can Be Granted

In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). A court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d

11

Cir. 1994). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (interpreting Fed.R.Civ.P. 8(a)) (internal quotations omitted). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 545 (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* Furthermore, "[w]hen there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1950 (2009). Such a determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.*

## IV. DISCUSSION

### A. Personal Jurisdiction Over Bonsall

In determining whether a court may exercise personal jurisdiction, a court must examine the relationship among the defendant, the forum, and the litigation. *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). Where the plaintiff's cause of action is related to or arises out of the defendant's contacts with the forum, the court is said to exercise "specific jurisdiction." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S.

12

408, 414 n. 8 (1984)).  In federal court, the exercise of specific jurisdiction must satisfy

the requirements of the Due Process Clause of the Fifth Amendment.  *See In re Real*

*Estate Title & Settlement Servs. Antitrust Litig.*, 869 F.2d 760, 766 n. 6 (3d Cir. 1989).

"[I]n assessing the sufficiency of a defendant's contacts with the forum, a court should

look at the extent to which the defendant 'availed himself of the privileges of American

law and the extent to which he could reasonably anticipate being involved in litigation in

the United States.'"  *Pinker*, 292 F.3d at 370 (quoting *Max Daetwyler Corp. v. Meyer*,

762 F.2d 290, 293 (3d Cir.1985)); *see also Hanson v. Denckla*, 357 U.S. 235, 253

(1958).  The final phase of assessing whether to exercise personal jurisdiction over a

defendant involves an analysis of whether jurisdiction comports with "traditional notions

of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316

(1945).

Jurisdiction over alleged violations of the 1934 Act is governed by § 27 of the

Act.  *See* 15 U.S.C. § 78aa.  Section 78aa provides in pertinent part:

> The District Courts of the United States . . . shall have exclusive
> jurisdiction of violations of this title or the rules and regulations thereunder,
> and of all suits in equity and actions at law brought to enforce any liability
> or duty created by this title or the rules and regulations thereunder.  Any
> suit or action to enforce any liability or duty created by this title or rules
> and regulations thereunder, or to enjoin any violation of such title or rules
> and regulations, may be brought in [the district wherein any act or
> transaction constituting the violation occurred] or in the district wherein the
> defendant is found or is an inhabitant or transacts business, and process
> in such cases may be served in any other district of which the defendant
> is an inhabitant or wherever the defendant may be found.

15 U.S.C. § 78aa.  As stated above, § 78aa provides for nationwide service of process.

The Third Circuit has held that a "national contacts analysis" is appropriate "when

appraising personal jurisdiction in a case arising under a federal statute that contains a nationwide service of process provision." *Pinker*, 292 F.3d at 369 (quoting *AlliedSignal, Inc. v. Blue Cross of Calif.*, 924 F. Supp. 24, 26 (D.N.J. 1996)).

The APS Parties argue that, notwithstanding the nationwide service of process provision in Section 78aa, the court's exercise of personal jurisdiction over Bonsall must still comport with Due Process. Bonsall has provided a declaration stating that he is living and working in Munich, Germany.[6]  (D.I. 12, ex. 11 at ¶ 4)  Snowstorm alleges, and the court must take as true at this time, that Bonsall is a resident of Michigan.[7]  (D.I. 1 at ¶ 2)  Notwithstanding, it is the APS Parties' position that it is neither "fair" nor "reasonable" to compel Bonsall to appear in Delaware in this case since he has "no contact" with Delaware in his individual capacity and "very little" contacts in a corporate capacity. (D.I. 18 at 5-6, citing *Pinker*, 292 F.3d at 370)  According to Bonsall, his "only contacts with Snowstorm or its agents prior to the filing of the complaint took place primarily in Wisconsin, where [TecumsehPower] is located and where the sale of stock [ ] took place, and in Tennessee, New York and Indiana for visits with Snowstorm to plant locations or to make a presentation." (D.I. 12, ex. 11 at ¶ 11)

The APS Parties' argument is unpersuasive with respect to Snowstorm's 10b-5 claim.

The due process requirement of *International Shoe v. Washington* [ ], that a

---

[6]Bonsall has not provided proof of residence.

[7]Snowstorm alleges, and the APS Parties do not dispute, that Bonsall:  (1) graduated from Michigan State University; (2) has worked as an executive in the United States for three decades; (3) is active in local and national civic and professional organizations; and (4) is a citizen of the United States.

14

> defendant have "minimum contacts" with a particular district or state for purposes of personal jurisdiction[,] is not a limitation imposed on the federal courts under Section 27 in a federal question case. Due process concerns under the Fifth Amendment are satisfied if a federal statute provides for nationwide service of process in federal court for federal question cases.

*FS Photo, Inc. v. PictureVision, Inc.*, 48 F. Supp. 2d 442, 445 (D. Del.1999) (internal

citations omitted). As Bonsall has undisputed minimum contacts with the United States,

he is amenable to personal jurisdiction in Delaware with respect to the 10b-5 claim. *Id.*

Neither the Delaware long-arm statute, 10 Del. C. § 3104(c), nor Fourteenth

Amendment Due Process concerns are invoked in this federal question action. *See*

*Heft v. All Corp.*, 355 F. Supp. 2d 757, 767-68 (M.D. Pa. 2005) ("Only the Fifth

Amendment governs the due process rights of individuals before the federal courts,

whether invoked on grounds of diversity or federal question[.]") (citations omitted) (cited

by the APS Parties at D.I. 18 at 5 & n.5).

Defendants do not specifically address Snowstorm's Exchange Act claim ("Count

III"). The standard for personal jurisdiction under § 20(a) is met if plaintiff makes a non-

frivolous allegation that defendant controlled a person liable for securities fraud. 15

U.S.C. §§ 78t(a), 78aa.[8] Put into context, Snowstorm was required to (and did) allege

that "Bonsall . . . had the power to influence and control and did influence and control,

---

[8]The statutory basis for jurisdiction provided in the Exchange Act renders fiduciary shield doctrine inapplicable. This doctrine states that "jurisdiction over [individual] defendants does not exist simply because they are agents or employees of organizations which presumably are amenable to jurisdiction in a particular forum." *Nicholas v. Saul Stone & Co.*, 224 F.3d 179, 184 (3d Cir. 2000). The APS Parties are incorrect, therefore, that this doctrine renders jurisdiction improper in this case. *See Merchants Nat. Bank, Topeka, Kan. for Stowers v. Safrabank* (California), Civ. No. 90-4194, 1991 WL 173781, *1 (D. Kan. Aug. 28, 1991) ("[M]ost courts have determined that the fiduciary shield doctrine is inapplicable when a federal statute provides for nationwide service of process.") (citations omitted).

directly and indirectly, the decision-making of Tecumseh Products and TecumsehPower including in particular the content and dissemination of the various false statements . . . which were materially false and misleading." (D.I. 1 at ¶ 63) It is also established that when jurisdiction is sufficient under the jurisdictional provision of the Exchange Act, the court also has jurisdiction over pendent state law claims. *See FS Photo*, 48 F. Supp. 2d at 445. For the foregoing reasons, the APS Parties' motion to dismiss is denied with respect to the court's jurisdiction over Bonsall.

### B. Snowstorm's Securities Fraud Claim Under § 10(b) of the Act

The APS Parties next move to dismiss Snowstorm's § 10(b) claims for failure to state a claim upon which relief may be granted. Complaints brought under § 10(b) of the Act are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which states:

> (b) Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

As applied to § 10(b) claims, "Rule 9(b) requires a plaintiff to plead[:] (1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006) (quoting *In re Rockefeller Center Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002)) (internal quotation marks and citation omitted). In sum, "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the

16

essential factual background that would accompany 'the first paragraph of any newspaper story'[–]that is, the 'who, what, when, where and how' of the events at issue." *Id.*

In addition, a plaintiff pursuing a securities fraud claim must meet the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) (the "PSLRA"). *See, e.g., Klein v. Autek Corp.*, 147 Fed. Appx. 270, 273-74 (3d Cir. 2005). As such, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," § 78u-4(b)(2). *Tellabs,* 551 U.S. at 321. To the extent that the requirements of Rule 9(b) conflict with the PSLRA, 15 U.S.C. § 78u-4(b)(2), "the PSLRA 'supersedes Rule 9(b) as it relates to Rule 10b-5 actions.'" *In re Suprema Specialties*, 438 F.3d at 277.

Rule 10b-5, promulgated under § 10(b) of the Act, 15 U.S.C. § 78j(b),[9] states:

It shall be unlawful for any person, directly or indirectly, by the use of any

---

[9]It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange–

(b)  To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

means or instrumentality of interstate commerce, or of the mails or of any
facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a
material fact necessary in order to make the statements made, in the light
of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates
or would operate as a fraud or deceit upon any person, in connection with
the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To state a claim under Rule 10b-5, Snowstorm must allege that

each defendant (1) made a misstatement or an omission of material fact (2) with

scienter (3) in connection with the purchase or the sale of a security upon which

Snowstorm (4) reasonably relied and Snowstorm's (5) reliance was the proximate

cause of its injury. *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir.

2009). In relation to a motion to dismiss a claim brought under § 10(b) of the Act, "[t]he

inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong

inference of scienter, not whether any individual allegation, scrutinized in isolation,

meets that standard." *Tellabs*, 551 U.S. at 323. "To determine whether the plaintiff has

alleged facts that give rise to the requisite 'strong inference' of scienter, a court must

consider plausible nonculpable explanations for the defendant's conduct, as well as

inferences favoring the plaintiff." *Id.* "A complaint will survive . . . only if a reasonable

person would deem the inference of scienter cogent and at least as compelling as any

opposing inference one could draw from the facts alleged." *Id.*

In the case at bar, the APS Parties challenge the sufficiency of Snowstorm's

complaint; Tecumseh Products has not joined the present motion. (D.I. 10) This is

18

important since AlixPartners and APS were not privy to the business deal between

Tecumseh Products and Snowstorm, and because Bonsall is alleged to have been

acting on behalf of Tecumseh Products (and, ostensibly, not on behalf of AlixPartners

and APS) on several occasions. (*See, e.g.*, D.I. 1 at ¶ 7 ("Bonsall executed the SPA on

behalf of Tecumseh Products as its Executive Vice President."); *id.* at ¶ 25 (" . . . MTD

sent a letter addressed to Bonsall, as President of TecumsehPower . . . .")) Moreover,

as will be discussed further below, all of the misrepresentations and omissions alleged

in Snowstorm's complaint were made by Bonsall or contained within documents

prepared by representatives of Tecumseh Products. As a result, the sufficiency of

Snowstorm's complaint as to its "Count II" depends on whether: (1) Snowstorm has

pled the elements of § 10(b) with particularity as they pertain to Bonsall; and (2)

whether Bonsall's actions may be imputed to AlixPartners and APS.

### 1. Group pleading

The APS Parties argue that Snowstorm's complaint lacks particularity largely

because multiple allegations of representations, knowledge and intent are directed

towards "defendants" collectively, as opposed to attributing each element to an

individual defendant (known as "group pleading"). "[T]he group pleading doctrine allows

a plaintiff to plead that defendants made a misstatement or omission of a material fact

without pleading particular facts associating the defendants to the alleged fraud." *Winer*

*Family Trust v. Queen*, 503 F.3d 319, 334 (3d Cir. 2007) (hereinafter, "*Winer Family*

*Trust*"). As a matter of first impression in *Winer Family Trust*, the Third Circuit held that

"the group pleading doctrine is no longer viable in private securities actions after the

19

enactment of the PSLRA." *Id.* at 337 (requiring "that allegations be set forth with particularity concerning 'the defendant' and scienter be ple[d] for 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind'"). To wit, Snowstorm's complaint does not contain any direct allegations of fraud particular to AlixPartners or APS. Thus, the court will only consider the misrepresentations and omissions alleged in Snowstorm's complaint attributed specifically to Bonsall (the Management Presentation, the SPA, and the Certificate) for the Second Count of Snowstorm's complaint, and will disregard the complaint to the extent that it implicates the collective APS Parties (the CIM).

### 2. Bonsall

#### a. Misrepresentations or omissions

Of the misrepresentations alleged by Snowstorm in its complaint, the following are attributed to Bonsall *vis a vis* the Management Presentation given on August 8, 2007:

(a) TecumsehPower has a "leading position in the snow thrower industry."

(b) TecumsehPower has "well-established customer relationships."

(c) The "long[-]term trend for the Snow Thrower . . . market [ ] has been one of continued growth."

(d) "[TecumsehPower] . . . engines have been a market leader and driver of the snow category for 45 years."

(e) "[TecumsehPower] . . . engines will again represent an 80% industry share in 2007."

(f) "Sales declines in 2006 and 2007 for MTD are mostly attributable to the overall industry declines in snow thrower sales."

20

(g) "Snow sales are expected to rebound in 2008 from the weather-related downturn in 2007."

(D.I. 1 at ¶ 38)  In addition, Snowstorm alleges that Bonsall made the following misrepresentations as executor of the SPA which were affirmed by the subsequent Certificate:

(a) TecumsehPower is not "engaged in any material disputes with [MTD] . . . that would result in a material decrease in the quantity of items purchased . . . ." (SPA Section 3.17)

(b) The Snow MOU is a "valid and legally binding obligation . . . [of MTD] . . . in accordance with its terms and conditions," and further, that neither MTD nor TecumsehPower was "in material breach or default [of the Snow MOU] . . . ." (SPA Section 3.9)

(*Id.* at ¶ 45)  Further, Bonsall failed to disclose the following information about TecumsehPower:  "[t]he on-going snow thrower engine 'quality' issues that TecumsehPower was then experiencing (and had been experiencing) with MTD; MTD had terminated the critical snow MOU on July 31, 2006; and MTD's repeated refusal to enter into an exclusive and/or long-term relationship with TecumsehPower." (*Id.* at ¶ 39)

The APS Parties argue that the statements alleged as misrepresentations made by Bonsall are not material to the extent that they consist of statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or vague and general statements of optimism which constitute non-actionable "puffery." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538-39 (3d Cir. 1999); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 642 (3d Cir. 1989).  The APS Parties cite two alleged misrepresentations made in the Management Presentation as examples of such non-actionable statements:  (1) "Tecumseh[Power] engines will again represent an 80%

21

industry share in 2007"; and (2) "[s]now sales are expected to rebound in 2008 from the weather related downturn in 2007."[10]  (D.I. 1 at ¶ 38)  On the motion at bar, the court need not attempt to determine if each of the alleged misrepresentations are sufficiently vague or subjective enough to render them legally immaterial.  *See In re RAIT Fin. Trust Sec. Litig.*, Civ. No. 07-03148, 2008 WL 5378164, at *5 (E.D. Pa. Dec. 22, 2008) ("The court may determine that the misstatements are immaterial as a matter of law only 'where the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality.").  At the least, each of the two statements from the SPA referenced by the complaint give the specific impression that the relationship between TecumsehPower and MTD was ongoing and economically viable.  Snowstorm's complaint is clear in asserting that such an impression was important to its decision to purchase TecumsehPower and, furthermore, was wholly inaccurate.  (*See* D.I. 1 at ¶ 46)  Although Bonsall had the chance to correct Snowstorm's misconception of the TecumsehPower-MTD relationship, Snowstorm alleges that Bonsall chose to omit the truth.  (*See id.* at ¶ 49) Thus, Snowstorm has pled with particularity that Bonsall made specific misrepresentations of material fact and omitted material information which would have prevented Snowstorm from being misled.

---

[10]In addition, the APS Parties claim that any forward-looking statements contained within the CIM are not material based on the "bespeaks caution" doctrine. Accordingly, cautionary language in the CIM would have precluded Snowstorm from relying on forecasts in the CIM.  *See In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 364 (3d Cir. 1993).  Notwithstanding, any potentially misleading statements in the CIM are not attributable to Bonsall, AlixPartners, or APS, so the CIM is not under consideration for purposes of the APS Parties' motion to dismiss.

### b. Scienter

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud,"
and requires a knowing or reckless state of mind. *Avaya*, 564 F.3d at 252 (internal
citations omitted). "A reckless statement is one involving . . . an extreme departure
from the standards of ordinary care, and which presents a danger of misleading buyers
or sellers that is either known to the defendant or is so obvious that the actor must have
been aware of it." *Id.* at 267 n.42. The court must be mindful of the heightened
pleading standards prescribed by the PSLRA throughout its analysis of Bonsall's state
of mind. *See Tellabs*, 551 U.S. at 324 (defining PSLRA's characterization of "strong"
inference as one that is "powerful or cogent"). As discussed above, the court must look
to the totality of the allegations in order to determine whether Bonsall acted with the
required level of intent. *See Avaya*, 564 F.3d at 272-73. Although the pleadings need
not present an irrefutable inference of scienter, Snowstorm's allegations as to Bonsall's
intent must remain "strong in light of other explanations." *Tellabs*, 551 U.S. at 324.
Accordingly, the court must examine Snowstorm's complaint to determine whether it
has adequately pled that the misrepresentations and omissions attributed to Bonsall
give rise to an inference of scienter that is at least as compelling as any nonculpable
explanations presented by the APS Parties. *See id.*

The Third Circuit has held that a securities fraud plaintiff may not merely allege
"motive and opportunity" as the requisite scienter necessary to survive a motion to
dismiss. *Avaya*, 564 F.3d at 277. Instead, motive may be a factor in analyzing the

23

defendant's state of mind, but the plaintiff's complaint must also include some element of volition on the part of the defendant. *See id.* Here, Snowstorm has alleged both motive and opportunity to commit fraud and actual knowledge on the part of Bonsall of the falsity of his statements at the time they were made. *See In re Vicuron Pharm., Inc. Sec. Litig.*, Civ. No. 04-2627, 2005 WL 2989674, at *10 (E.D. Pa. July 1, 2005). As of July 17, 2006, Bonsall was put on notice that MTD intended to end its relationship with TecumsehPower due to, inter alia, issues of quality control. (*See* D.I. 1 at ¶ 25) On July 31, 2006, Bonsall's awareness of the souring of the TecumsehPower-MTD relationship was reaffirmed by a response letter from MTD stating that, "MTD simply cannot commit to making [TecumsehPower] its exclusive provider of snow engines through the 2008 season." (*Id.* at ¶ 27) For their part, the APS Parties have not provided any plausible nonculpable explanations for withholding such information.[11] In light of such circumstances, Snowstorm has adequately pled that statements made by Bonsall at the Management Presentation and in the SPA, such as, TecumsehPower is not "engaged in any material disputes with [MTD] . . . that would result in a material decrease in the quantity of items purchased . . . " (*id.* at ¶ 45), were made with fraudulent intent–that is, actual awareness of falsity–to induce Snowstorm's purchase of TecumsehPower.

### c. Proximate cause

---

[11]The APS Parties merely assert that the Snow MOU disclosed that it was not a binding contract, so Snowstorm should not have relied on it for information about the TecumsehPower-MTD relationship. This argument does not explain why Bonsall would make statements in the SPA and Management Presentation regarding the strength of the relationship when he knew otherwise.

24

In order to plead causation as required for a 10b-5 claim, a plaintiff must allege both an economic loss and loss causation. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). The purpose of securities statutes such as the Act is "to protect [investors] against those economic losses that misrepresentations **actually cause**." *Id/* at 345 (emphasis added). Thus, in order to survive the APS Parties' motion to dismiss, Snowstorm must have pled with particularity that Bonsall's misrepresentations were the proximate cause of an alleged economic loss.[12] *See id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 252 (1988) (White, J., joined by O'Connor, J., concurring in part and dissenting in part) ("[A]llowing recovery in the face of affirmative evidence of nonreliance [ ] would effectively convert Rule 10b-5 into a scheme of investor's insurance.") (internal quotation marks and citations omitted)).

Snowstorm pled that it "has lost its entire investment in TecumsehPower" due to the misinformation supplied by Bonsall. (D.I. 1 at 1) As such, Snowstorm alleges that it experienced an economic loss of at least $51 million in connection with shutting down the operations of TecumsehPower. (*Id.* at ¶ 44) Further, Snowstorm alleges that it "never would have purchased the stock of TecumsehPower" if it had known that the MTD relationship was no longer in existence. (*Id.* at ¶ 48) The APS Parties argue that Snowstorm's complaint fails to adequately plead causation because: (1) disclosures contained within the Snow MOU express that the MOU is not a binding contract; and (2) TecumsehPower's fifth-largest customer, Powermate Corporation, filed a voluntary petition for bankruptcy on March 17, 2008. These arguments address the substance of

---

[12]"Whether the plaintiff has proven causation is usually reserved for the trier of fact." *See EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d at 884-85.

the claim. Snowstorm has alleged a concrete economic loss (the $51 million dollar investment in TecumsehPower) which Snowstorm alleges resulted from Bonsall's misrepresentations (regarding the strength of TecumsehPower's relationship with its biggest customer, MTD). Viewing all facts and inferences in the light most favorable to Snowstorm, it has pled with sufficient particularity that the above-mentioned misrepresentations were made by Bonsall with intent to mislead Snowstorm about the viability of TecumsehPower's snow engine business, and Bonsall purposefully omitted vital information which would have cleared up Snowstorm's mistaken reliance. Accordingly, the APS Parties' motion to dismiss is denied as to Bonsall on this count.[13]

### 3. The APS Parties

Because AlixPartners and APS were not directly involved in the transactions that led to the sale of TecumsehPower, Snowstorm must rely on circumstantial pleading and imputed liability in order to state a claim of securities fraud against the APS Parties. Although Snowstorm's complaint focuses on the statements of Bonsall and Busch, liability for such statements, if they were fraudulent, can also be imputed to AlixPartners and APS because "[a] corporation is liable for statements by employees who have apparent authority to make them." *Avaya*, 564 F.3d at 252 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc. ("Tellabs II")*, 513 F.3d 702, 708 (7th Cir. 2008)) (explaining that "the doctrines of respondeat superior and apparent authority remain applicable to

---

[13]The APS Parties do not dispute that Snowstorm has pled the third and fourth factors of a 10b-5 claim. Notwithstanding, Snowstorm has sufficiently pled that its purchase of TecumsehPower involves the sale of a security, (*see, e.g.*, D.I. 1 at ¶ 44), and that Snowstorm reasonably relied on the statements confirmed by the Certificate executed by Bonsall in connection with the purchase of TecumsehPower. (*See id.* at ¶ 48)

suits for securities fraud.")).  Apparent authority is "the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."  RESTATEMENT (THIRD) OF AGENCY § 2.03.  Corporate liability under Rule 10b-5 requires "look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)[.]"  *Tellabs II*, 513 F.3d at 708; *see City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, Civ. No. 08-969, 2009 WL 3837659, at *6 (D. Del. 2009) ("[A] corporate defendant will not be held liable absent a showing that at least one individual officer who made, or participated in the making of, a false or misleading statement did so with scienter.").

Snowstorm has alleged that, at the time he executed the SPA, Bonsall was Executive Vice President of Tecumseh Products and President of TecumsehPower, as well as a managing director of AlixPartners.  (D.I. 1 at ¶ 7)  The complaint, however, does not contain any facts relevant to whether Bonsall was acting within the scope of apparent authority on behalf of AlixPartners when he conducted the Management Presentation or executed the SPA.[14]  There is no indication that Snowstorm was even aware of the existence of AlixPartners at the time of the TecumsehPower sale.  Having failed to allege that Bonsall was acting on behalf of AlixPartners a the relevant times, the complaint also fails to provide the connection to APS, AlixPartners' affiliate.

_____

[14]Snowstorm identifies no such facts in its response papers.  (D.I. 17 at 25-26)

27

Accordingly, the APS Parties' motion to dismiss is granted as to Snowstorm's § 10(b)

claim against AlixPartners and APS.

### C. "Controlled Person" Liability Under § 20(a) of the Act

Section 20(a) of the Act, 15 U.S.C. § 78t(a), states that:

> Every person who, directly or indirectly, controls any person liable under
> any provision of this chapter or of any rule or regulation thereunder shall
> also be liable jointly and severally with and to the same extent as such
> controlled person to any person to whom such controlled person is liable,
> unless the controlling person acted in good faith and did not directly or
> indirectly induce the act or acts constituting the violation or cause of
> action.

15 U.S.C. § 78t(a). Under this provision, a court may find a defendant liable who

exercises control over a "controlled person" who has violated § 10(b) of the Act. *Avaya*,

564 F.3d at 252. "The term 'control' (including the terms 'controlling,' 'controlled by' and

'under common control with') means the possession, direct or indirect, of the power to

direct or cause the direction of the management and policies of a person, whether

through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. §

240.12b-2. A securities fraud plaintiff must prove "not only that one person controlled

another person, but also that the 'controlled person' is liable under the Act." *In re*

*Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004). "[S]econdary liability cannot

be found under § 20(a) unless it can be shown that the defendant was a culpable

participant in the fraud." *In re Suprema Specialties*, 438 F.3d at 284 n.16 (quoting

*Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 890 (3d Cir. 1975)). Further, "the

heightened standard of the PSLRA requires that a claim under § 20(a) state with

particularity the circumstances of both the [defendant's] control of the primary violator,

28

as well as of the [defendant's] culpability as [a] controlling person[ ]." *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 561 (D. Del. 2002), *aff'd*, 357 F.3d 322 (3d Cir. 2004).

Snowstorm has alleged that Tecumseh Products (d/b/a TecumsehPower):  (1) was a primary violator of § 10(b) of the Act; and (2) was actually controlled by each of the APS Parties.  Snowstorm has alleged control over Tecumseh Products by Bonsall in his capacity as Executive Vice President of Tecumseh Products and President of TecumsehPower.   More specifically, Snowstorm has alleged that Bonsall "was given primary responsibility for Tecumseh Products' strategic direction, overall management and day-to-day operations."[15]  (D.I. 1 at ¶ 33)  It does not appear that Snowstorm specifically pled facts tending to show Bonsall's ability to change the management or policies of Tecumseh Products but, viewing the complaint in a light most favorable to Snowstorm, Bonsall was a major player in the operations of that company.  The court finds, therefore, that Snowstorm has pled with particularity that Tecumseh Products violated § 10(b) of the Act through imputed liability based on the acts of its Executive Vice President, Bonsall.

By contrast, Snowstorm has not pled that AlixPartners maintained control of the operations of Tecumseh Products **at the time of the transaction in question**.  Instead, the complaint merely points to AlixPartners' pre-sale direction of TecumsehPower pursuant to the Letter Agreements.  (*See, e.g.*, D.I. 1 at ¶ 11; *Id.* at ¶ 15 ("[U]nder the direction of AlixPartners and Bonsall, TecumsehPower exited the vertical lawn and

---

[15]"The mere fact that an individual is a director of a firm is not sufficient to show he is a control[ling] person of the firm," *In re Digital Island*, 223 F. Supp. 2d at 561 (quoting *In re Splash Tech. Holdings Sec. Litig.*, Civ. No. 99-00109, 2000 WL 1727377, at *16 (N.D. Cal. Sept. 29, 2000)).

garden engine business . . . ."); *Id.* at ¶ 16 (" . . . TecumsehPower's decision to shut

down its lawnmower engine operations at the direction of AlixPartners")) Additionally,

the post-sale allegations within the complaint directed towards "defendants" collectively

impermissibly rely on group pleading. *See Winer Family Trust*, 503 F.3d at 337. Thus,

Snowstorm has not pled with particularity that AlixPartners and APS were in control of

TecumsehPower at the time of the alleged fraud; its claims are dismissed with respect to

these parties.

### D. Snowstorm's Pendent State Law Claims

Snowstorm asserts two state law claims[16] which are based on the same nucleus

of operative facts as the above federal claim; to wit, the preceding paragraphs of the

complaint are incorporated into each claim by reference.

### 1. Common law fraud

In Delaware, common law fraud consists of:

> (1) a false representation, usually one of fact, made by the defendant; (2)
> the defendant's knowledge or belief that the representation was false, or
> was made with reckless indifference to the truth; (3) an intent to induce the
> plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction
> taken in justifiable reliance upon the representation; and (5) damage to the
> plaintiff as a result of such reliance.

*Norman v. Elkin*, 617 F. Supp. 2d 303, 315 n.6 (D. Del. 2009) (citing *Gaffin v. Teledyne,*

*Inc.*, 611 A.2d 467, 472 (Del. 1992)).[17] "There are three recognized species of common

---

[16]Counts IV and VI.

[17]Snowstorm states in its opposition brief that whether Delaware or Wisconsin
state law applies to its claim of common law fraud is undecided. Under Wisconsin law,
the elements of common law fraud are essentially identical and, therefore, it is not
necessary for the court to address the issue here. *See, e.g., Kaloti Enterprises, Inc. v.
Kellogg Sales Co.*, 699 N.W.2d 205, 211 (Wis. 2005) (iterating factors).

law fraud: (1) affirmative falsehoods; (2) active concealment; and (3) silence in the face of a duty to speak." *Airborne Health, Inc. v. Squid Soap, LP*, Civ. No. 4410, 2010 WL 2836391, at *7 (Del. July 20, 2010) (citing *Metro Commc'n Corp. BVI v. Advanced MobleComm Tech. Inc.*, 854 A.2d 121, 143 (Del. Ch. 2004)). Although a claim for common law fraud is not subject to the heightened pleading standards of the PSLRA, it still must be pled with particularity per Fed. R. Civ. P. 9(b). *See generally Abbott Labs. v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 431-32 (D. Del. 2006).

The court finds Snowstorm's pleadings sufficient in this regard. The operative facts pled by Snowstorm for it § 10(b) claim against the APS Parties suffice to support its common law fraud claim against these parties. Snowstorm has alleged that Bonsall made specific misrepresentations and omissions of material fact about the TecumsehPower-MTD relationship with the intent to induce Snowstorm into purchasing TecumsehPower. As discussed above, the complaint also contains facts particular to Snowstorm's justifiable reliance and consequent damages. Additionally, liability may be imputed to AlixPartners and APS as employers of Bonsall. *See Triton Const. Co., Inc. v. Eastern Shore Elec. Services, Inc.*, Civ. No. 3290, 2009 WL 1387115, at *16 (Del. Ch. May 18, 2009) ("[I]t is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation."). Accordingly, the APS Parties' motion to dismiss is denied as to count IV.

### 2. Negligent misrepresentation

A negligent misrepresentation claim under Delaware law requires the plaintiff to

prove: "(1) a pecuniary duty to provide accurate information; (2) the supplying of false information; (3) failure to exercise reasonable care in obtaining or communicating information; and (4) a pecuniary loss caused by justifiable reliance upon the false information." *Westfield Ins. Co. v. Chip Slaughter Auto Wholesale, Inc.*, Civ. No. 08-56, 2010 WL 2428133, at *10 (D. Del. June 16, 2010) (citing *Darnell v. Myers*, Civ. No. 14859, 1998 WL 294012, at *5 (Del. Ch. May 27, 1998)).[18] "A negligent misrepresentation claim . . . is in essence a fraud claim with a reduced state of mind requirement." *Corporate Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, Civ. No. 3231, 2008 WL 963048 (Del. Ch. Apr. 10, 2008). Thus, "the Rule 9(b) heightened pleading requirement generally does not apply to [a] state law claim[ ] of . . . negligent misrepresentation." *Lincoln Nat. Life Ins. Co. v. Snyder*, Civ. No. 09-888, 2010 WL 2787453, at *10 (D. Del. July 15, 2010) (quoting *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 197 (D. Del. 2000) (citation omitted)).

Aside from incorporating the prior paragraphs by reference, Snowstorm's claim for negligent misrepresentation reads succinctly as follows:

> 75. Defendants, individually and collectively, made false representations of fact with the intent to induce Snowstorm to acquire the shares of TecumsehPower, when defendants had a duty to exercise ordinary care in making the representations or in ascertaining the actual facts.
> 76. Defendants breached their duty to Snowstorm.
>
> 77. As a direct and proximate result, Snowstorm suffered damages.

---

[18]Again, to the extent Snowstorm suggests that Wisconsin law applies to its common law claims, *supra* note 14, the court need not determine the issue insofar as the elements of a claim of negligent misrepresentation are essentially identical under the law of either state. *See, e.g., Hatleberg v. Norwest Bank Wisconsin*, 700 N.W.2d 15, 26 (Wis. 2005) (iterating factors).

78. Snowstorm justifiably relied on the false representations.

(D.I. 1)  Snowstorm has not identified what false information the APS Parties supposedly

provided to it.  The complaint states that AlixPartners and APS were paid compensation

by Tecumseh; there are no other facts tending to indicate that the APS Parties had the

necessary pecuniary duty to provide accurate information to Snowstorm.  The APS

Parties point out that AlixPartners was no longer in a contractual relationship with

Tecumseh when the SPA was executed, and APS' compensation was not dependant

upon the consummation of the transaction.  (D.I. 11 at 25-26)  In its opposition,

Snowstorm states only that "the APS [Parties'] dissemination of information contained in

the SPA was exclusively to Snowstorm;" no other assertions are made in support of

Snowstorm's position that it has sufficiently pled its claim.  (D.I. 17 at 37)  Since "the law

pares down the class of potentially liable defendants to those with a pecuniary duty to

provide accurate information," and Snowstorm has not provided facts tending to

demonstrate the existence of such a duty, its count VI must be dismissed.  *See*

*Corporate Prop. Assocs. 14 Inc.*, 2008 WL 963048 at \*8 (citing Restatement (Second) of

Torts § 252 cmt. c (1977)).

Finally, the court notes that plaintiff seeks unspecified compensatory and

punitive damages against all defendants, as well as its costs and expenses, and a

declaratory judgment that Tecumseh Products has an obligation pursuant to the SPA to

hold Snowstorm and its representatives and stockholders harmless against any losses

and claims.  (D.I. 1 at 20-21)  The economic loss doctrine precludes recovery in

negligence for losses that are solely economic in nature.  "Under the economic loss

doctrine, a claim of negligent misrepresentation is only appropriate where the complaint

33

alleges noneconomic losses such as personal injury or damage to property that is not the subject of the underlying claim." *Palma, Inc. v. Claymont Fire Co., No. 1*, Civ. No. 09L-06-121, 2009 WL 3865395 at *1 (Del. Super. Nov. 19, 2009). There is no such separate loss alleged here.

Delaware has adopted an exception to the economic loss doctrine, whereby a plaintiff may invoke a negligent misrepresentation cause of action by showing two elements: (1) "that the defendant supplied the information to the plaintiff for use in business transactions with third parties[;]" and (2) that "the defendant is in the business of supplying information." *Christiana Marine Svc. Corp. v. Texaco Fuel and Marine Mktg. Co.*, Civ. No. 98C-02-217, 2002 WL 1335360 at *5 (Del. Super. June 13, 2002) (citations omitted). Snowstorm asserts in its opposition papers that the APS Parties' "core mission is to improve its clients['] financial and operational performance, execute corporate turnarounds, and provide litigation consulting and forensic accounting. In other words, [they] provide business and other advice in much the same manner – if not in substance – as an accountant or lawyer." (D.I. 17 at 38) Snowstorm does not cite to its complaint in support for this argument.

With respect to AlixPartners, the complaint does provide that it is a "self-described global business advisory firm which purports to improve corporate performance [and] execute corporate turnarounds;" AP Services is described as its affiliate "advisors." (D.I. 1 at ¶ 10) Bonsall was given the responsibility of "evaluating and implementing strategic and tactical options for performance improvement" at Tecumseh. (*Id.* at ¶ 11) Although it is clear from the complaint that certain advice was provided by the APS Parties, it is equally plausible that the defendants supplied

34

information "ancillary to the sale of a . . . service," namely, the performance improvement of Tecumseh. *See Christiana Marine Svc. Corp.*, 2002 WL 1335360 at *7. It may be Snowstorm's goal to assert that each defendant is "in the business of supplying information for the guidance of others," *see id.*, but it has not sufficiently done so in the complaint at bar. Moreover, there is no allegation that the APS Parties supplied information for use in business transactions with third parties.